942 So.2d 1244 (2006)
STATE of Louisiana, Appellee,
v.
Travis Orlando ALLEN, Appellant.
No. 41,548-KA.
Court of Appeal of Louisiana, Second Circuit.
November 15, 2006.
*1249 W. Jarred Franklin, Louisiana Appellate Project, for Appellant.
Jerry L. Jones, District Attorney, Cynthia P. Lavespere, Assistant District Attorney, for Appellee.
Before WILLIAMS, CARAWAY and MOORE, JJ.
CARAWAY, J.
Travis Orlando Allen was convicted of second degree murder in violation of La. R.S. 14:30.1 and sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence. Allen appeals his conviction and sentence. We affirm.

Facts
Claude Brown was concerned after his daughter, Antinissin Kirston Brown ("Brown"), unexpectedly missed a weekly family meeting. When family members called Brown's cell phone, it was answered by Grace Robinson, who told them she found it near a school. When the family retrieved the phone from Ms. Robinson, it looked bloody. Mr. Brown went to his daughter's home. His knocks at the front door went unanswered, so he checked the back door and found it unlocked. Hearing loud music playing inside, Mr. Brown decided to call the police.
The officers found the small house in disarray. Going through the home, they found blood droplets in a hall leading towards the front/living room area. Once in the hall, officers opened the bathroom door and found a bloody scene. Across the hall, officers saw Brown's nude body lying on the bedroom floor. Her head was covered by a blanket. Brown had been "hogtied" with seven types of ligatures including an iron cord, a cable cord, an extension cord and a purse strap. Her head had been covered by cloth which was bound at her neck by one of the ligatures. After removing the head covering, officers discovered a sock stuffed in Brown's throat. Brown's head lacerations resulted from blows using a claw hammer found at the crime scene. The coroner determined the cause of Brown's death as suffocation and brain hemorrhage.
Brown's cell phone call activity showed she had talked to someone named Travis. Brown's banking records showed activity occurring after her death on April 17, 2005. Police obtained surveillance photographs of an individual using Brown's bank card to withdraw cash from her account. As police were seeking more information on "Travis," they received an anonymous tip that someone named Travis worked at a restaurant in the mall and had been acting suspicious. After confirming that Travis Allen was employed at the restaurant, Detective Mark Nappier interviewed him and identified Allen as the same individual who used Brown's bank card. Allen was taken into custody.
Allen eventually confessed to killing Brown with whom he had a relationship for two months. He also admitted spending $2,700 shopping with her savings after her death. At trial, Allen claimed the murder was caused by a fight that just got out of hand. The jury convicted Allen of second degree murder. This appeal ensued.

Discussion
Sufficiency of the Evidence
Allen argues that the killing was in fact manslaughter because the victim was the *1250 initial aggressor, and the fight "got out of hand." He also contends that the state failed to prove that the offense was committed during the perpetration of an armed robbery.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992).
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La. App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990). Such state of mind can be formed in an instant. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382. Specific intent need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Taylor, 621 So.2d 141 (La.App. 2d Cir.1993), writ denied, 93-2054 (La.2/11/94), 634 So.2d 371. Specific intent may be established by circumstantial evidence alone if every reasonable hypothesis of innocence is excluded. State v. Cousan, supra. The determination of whether the requisite intent is present *1251 in a criminal case is for the trier of fact. State v. Brown, 618 So.2d 629 (La. App. 2d Cir.1993), writ denied, 624 So.2d 1222 (La.1993).
A defendant's confession is direct evidence, for it is an acknowledgment of guilt for which no inference need be drawn. La. R.S. 15:449; State v. McNeal, 34,593 (La.App.2d Cir.4/4/01), 785 So.2d 957; State v. Jones, 451 So.2d 35 (La.App. 2d Cir.1984), writ denied, 456 So.2d 171 (La.1984). It is well settled that a person cannot be convicted on his confession alone. State v. Hopkins, 35,146 (La. App.2d Cir.11/02/01), 799 So.2d 1234. However, once proof independent of the confession confirms the fact of death by violent means, the confession alone can supply the proof linking the accused to the crime. Additionally, the confession can prove the elements essential to determining the degree of the crime, such as intent, or the underlying felony in a felony-murder prosecution. State v. Bryant, 29,344 (La.App.2d Cir.5/7/97), 694 So.2d 556; State v. Cutwright, 626 So.2d 780 (La.App. 2d Cir.1993), writ denied, 632 So.2d 761 (La.1994). This corroboration rule requires only that there be some evidence other than the confession that a criminal act was committed. State v. Cutwright, supra.
La. R.S. 14:30.1 provides, in pertinent part, that second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2)(a) When the offender is engaged in the perpetration or attempted perpetration of . . . armed robbery, . . . or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
La. R.S. 14:64 provides in part that armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
La. R.S. 14:31 defines manslaughter in pertinent part as:
A.(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
Manslaughter is a homicide which would either be first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his cool reflection and self-control. La. R.S. 14:31(A)(1). The elements of "sudden passion" and "heat of blood" are mitigatory factors in the nature of a defense, and when the defendant establishes such factors by a preponderance of the evidence, a verdict for murder is inappropriate. State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108; State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254, 1260, cert. denied, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). In addition, provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control. *1252 See Reporter's Comment to La. R.S. 14:31 and State v. Mayfield, 186 La. 318, 322, 172 So. 171, 172 (1937).
A jury is not required constitutionally to agree on a single theory to convict a defendant where it is instructed as to alternate theories. Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991); State v. Vergo, 594 So.2d 1360 (La.App. 2d Cir.1992), writ denied, 598 So.2d 373 (La.1992).
The physical evidence in this case depicted extreme violence through blood drops on the hall floor and blood spattering on the bedroom and bathroom walls. The coroner's testimony described three wounds to the victim's head causing trauma sufficient to result in death. In the coroner's opinion, Brown died from a combination of injuries. In addition to head trauma, evidence of strangulation, suffocation from a blood-soiled sock (stuffed) down her throat and protruding from her mouth was presented. The coroner noted the victim was alive when she was asphyxiated.
The investigating officers presented the evidence describing the crime scene. Officer Kenneth Hancock was accepted as an expert in crime scene and blood spatter analysis. He found both transfer and castoff blood on the bathroom walls which was probably "splashed" on the wall from the hammer as Allen raised it in between blows to the victim.
Detective Quentin Holmes testified that although blood and hair follicles were present on the hammer's tip, the hammer was not extremely bloody and may have been wiped off. He also stated the victim was bound with various ligatures, including clothing, an electric iron cord, a purse strap, cable cord, a regular extension cord, and a heavy duty orange extension cord. Brown's ankles were tied together with clothing and her bound hands and feet were connected by another cord.
Allen testified in his own behalf and stated that he and Brown fought on April 17, 2005, and the argument escalated into a physical confrontation. After some pushing and shoving, Allen began punching Brown and she picked up the hammer during the fight. Brown did not swing the hammer. Allen took it away from her and ultimately used it to kill her. Allen testified that he initially hit Brown in the head with the hammer in the foyer area near the bathroom. Then he pushed her into the bathtub and went into her bedroom. The victim walked into the bedroom from the bathroom. Allen testified that he "felt that she would probably come trying to . . . come at me." The defendant acknowledged that Brown was not "really aggressive" at this point, but he nevertheless wrestled her onto the mattress, where he held her in a choke hold until she was unconscious. He admitted that he put the sock down her throat to stop her from yelling and that he tied Brown up with six or seven straps to prevent her from getting up.
In his trial testimony, Allen also admitted that he moved the victim's purse from the living room into the bedroom and removed $30 and the victim's bank card. Allen then left the house in the victim's car to ride around the block, looking to see if any police were in the area. Not seeing any officers, the defendant returned to Brown's house and after kicking her foot, realized she was dead. At this time, Allen went to Brown's bank and withdrew $20.00 from the ATM using Brown's personal identification number. Next, Allen went *1253 to a convenience store and withdrew $400.00 from the bank account. Allen claimed he withdrew the money only after realizing, "I knew that I was going to eventually get caught. I wanted to take care of the last . . . the three people that I cared about." He again testified that the murder accidentally happened after a fight gone wrong. Allen stated that he threw a blanket over Brown to suffocate her and washed the hammer off before he left.
That evening, he took another girlfriend to Wal-Mart and purchased clothing for her using Brown's money. The following morning, he cashed a forged check belonging to Brown obtained from her purse. He then spent several hours at the mall using Brown's card buying for his child and mother items like roses and jewelry.[1] Kim Williams, one of Allen's girlfriends, confirmed that they went to Wal-Mart in the late evening of April 17, 2005. Allen told her he robbed someone but she did not believe him. She saw blood stains on his pants while they were shopping.
At trial, Allen recanted part of his confession in which he claimed to have killed Brown because she threatened to tell her girlfriend about their relationship and because he did not want her to go to Las Vegas. He also denied statements that he hit Brown more than once with the hammer in an effort "to finish it off" so he would not go to jail. Allen's confession was played for the jury.
When viewed in the light most favorable to the state, we find the evidence sufficient to convict Allen of the second degree murder of Brown. Because there were no independent eyewitnesses to the crime, proof of the offense was by circumstantial evidence and the direct evidence contained in Allen's statements. Although at trial Allen claimed to have only hit the victim once with the hammer, the physical evidence corroborates Allen's confession statement that the victim was hit more than once on the head with the hammer. In fact, the blood spattering and head lacerations showed that she was probably hit three times. The jury was free to accept those statements and the evidence as being the most credible. Although Allen argues that it was the parties' argument and fight that caused him to lose his cool and murder the victim, he also admitted in his confession that the victim never took a swing at him, that he was aware that he did not need the hammer to win the fight, that he later washed the hammer, and that he committed the theft of the victim's property. Such rational considerations and deliberate actions during this type of confrontation undercut the reasonableness of Allen's claim to have lost his self-control or cool reflection. Even if the jury had considered that the argument precipitated the first blow, the remaining evidence plainly establishes that Allen developed the specific intent to kill Brown. In his confession, Allen admitted that he hit the victim the second time to "finish it off." At trial, he acknowledged that when she walked into the bedroom she was not in an aggressive posture, yet he bound her and choked her to unconsciousness. From the energy, time and thought required to secure that number of ligatures and tie the victim, the jury could have reasonably inferred that Allen had regained any composure lost by the initial fight and by this point, clearly understood and purposefully *1254 intended the consequences of his actions. The physical evidence corroborates his pre-trial confession.
Based upon the evidence relating to Allen's actions, his confession to police and the nature and extent of the victim's injuries, we find that a rational trier of fact could have found beyond a reasonable doubt that Allen was guilty of second degree murder both under the felony (armed robbery)[2] and specific intent portions of La. R.S. 14:30.1(A)(1) and (2)(a). The evidence supports the finding that Allen did not meet his burden of proving that he acted in sudden passion or heat of blood. While the victim might have introduced the hammer into the altercation, the defendant had ample opportunity to minimize the situation rather than escalate it. From this evidence, the jury could have reasonably rejected his manslaughter claim. Thus, no reversible error exists in the jury verdict.
Expert Testimony
Allen next argues that the state failed to show that Officer Hancock was qualified to present testimony regarding blood spatter, and that he was prejudiced by admission of the testimony.
As provided by La. C.E. art. 702, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
In State v. Foret, 628 So.2d 1116 (La.1993), the Louisiana Supreme Court adopted the test set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), regarding proper standards for the admissibility of expert testimony which requires the trial court to act in a gatekeeping function to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. State v. Chauvin, 02-1188 (La.5/20/03), 846 So.2d 697. To assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue, the Supreme Court suggested the following general observations are appropriate: 1) whether the theory or technique can be and has been tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the methodology is generally accepted by the relevant scientific community. Daubert, 509 U.S. at 592-594, 113 S.Ct. 2786. In Foret, supra, the court adopted these observations as a helpful guide for our lower *1255 courts in considering this difficult issue. Id. Thus, Louisiana has adopted Daubert's requirement that in order for technical or scientific expert testimony to be admissible under La. C.E. Art. 702, the scientific evidence must rise to a threshold level of reliability. Daubert's general "gatekeeping" applies not only to testimony based upon scientific knowledge, but also to testimony based on "technical" and "other specialized knowledge." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999); Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181 (La.2/29/00), 755 So.2d 226. The trial court may consider one or more of the four Daubert factors, but that list of factors neither necessarily nor exclusively applies to all experts or in every case. Id. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determinations. Kumho, supra at 526 U.S. 142, 119 S.Ct. 1167.
A trial court has great discretion in determining the competence of an expert witness, and that determination will not be overturned absent an abuse of discretion. La. C.E. art. 702; State v. Gipson, 37,132 (La.App.2d Cir.6/25/03), 850 So.2d 973, writ denied, 03-2238 (La.1/30/04), 865 So.2d 75. The test of competency of an expert is his knowledge of the subject about which he is called upon to express an opinion. A combination of specialized training, work experience, and practical application of the expert's knowledge can combine to demonstrate that a person is an expert. State v. Gipson, supra.
This court has previously noted that blood spatter analysis is not a precise discipline. See State v. Powell, 598 So.2d 454 (La.App. 2d Cir.1992), writ denied, 605 So.2d 1089 (La.1992). The jurisprudence of the Louisiana Supreme Court subsequent to State v. Foret, supra, has allowed experts to qualify in the field of blood spatter analysis. See State v. Allen, 03-2418 (La.6/29/05), 913 So.2d 788; State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044.
There is no rule of law, statutory or jurisprudential, which requires that different standards be placed on those witnesses who seek to be qualified as an expert in a field for the first time. Rather, the same standard of competency applies to all and a trial judge is only required to satisfy himself that the witness's competency has been established prior to qualifying him as an expert. State v. Allen, supra; State v. Smith, 448 So.2d 778 (La. App. 2d Cir.1984).
Allen complains that Officer Hancock did not have enough specialized training in blood spatter analysis to be accepted as an expert. Officer Hancock testified that he processed the crime scene. A video of the crime scene was played for the jury and narrated by Officer Hancock. He discussed the blood evidence found on the scene. The defense objected on the ground that there was no foundation for the witness being qualified as an expert in the field of evaluating blood evidence. The state then began voir dire regarding the witness's qualifications. Officer Hancock testified that he had 17 years experience as an officer and attended classes in the identification and collection of various forms of evidence. His duties included observing different types of blood evidence. He attended three schools teaching skills in working with blood evidence. The officer also testified as to his experience *1256 with numerous crime scenes involving blood spatter identification.
During cross-examination, Officer Hancock acknowledged he did not have specific certification for blood spatter evidence, but was certified in crime scene collection. A portion of this schooling included instruction in blood spatter technique. He also had on-the-job training involving investigating crime scenes with blood spatters. The defense's objection was to the witness's qualifications in the particular field of blood spatter. The trial court accepted the witness as an expert in both the field of crime scene investigation and in blood spatter. The court informed the jury that it would weigh the witness's testimony just like any other witness.
We cannot discern an abuse of discretion by the trial court in the qualification of Officer Hancock as an expert in the area of blood spatter. Officer Hancock's testimony indicates he had sufficient training and on-the-job experience and application by working numerous crime scenes to provide the background sufficient for establishing him as an expert. (See State v. Manning, supra at 1089 and cases cited therein comparing blood spatter experts' qualifications.) The fact that this witness has not been previously qualified in this area does not preclude him from being accepted as an expert in this case. State v. Allen, supra. The trial court clearly instructed the jury to determine the weight and credibility that his testimony deserved. The defendant cross-examined the witness as to his qualifications and the conclusions drawn by the witness from his expert analysis. Additionally, Allen has failed to show the likelihood of prejudice from the witness's testimony by only making general allegations of prejudice and not presenting specific claims. Thus, this argument lacks merit.
Voluntariness of Confession
Allen contends that despite being advised of his right to remain silent, he never made an effective waiver of that right because undue influence and coercion were exercised upon him when he confessed. Specifically, he claims that several statements made by police detectives during their interrogation prompted his confessions.
Before a confession can be introduced into evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451; La. C. Cr. P. art. 703(D); State v. Bowers, 39,970 (La.App.2d Cir.8/19/05), 909 So.2d 1038; State v. Roddy, 33,112 (La.App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, 00-1427 (La.5/11/01), 791 So.2d 1288. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his Miranda rights. State v. Bowers, supra; State v. Roddy, supra. At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, supra
In State v. Jackson, 381 So.2d 485 (La.1980), and State v. Morvant, 384 So.2d 765 (La.1980), the supreme court stated the principles under which the admissibility of a confession must be judged. As a matter of federal constitutional law, any confession obtained by any direct or implied promises, however slight, or by the exertion of any improper influence, must be considered involuntary and inadmissible. State v. Roddy, supra. The admissibility *1257 of a confession is a question for the trial court. When determining admissibility, the trial court's conclusions on the credibility and weight of testimony relating to the voluntary nature of the confession will not be overturned on appeal unless not supported by the evidence. State v. Thibodeaux, 98-1673 (La.9/8/99), 750 So.2d 916, 922, cert. denied, 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000); State v. Bowers, supra. Great weight is given to the trial court's factual determinations because of its opportunity to observe witnesses and assess credibility. State v. Thibodeaux, supra; State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082. Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Bowers, supra; State v. Henderson, 31,986 (La.App.2d Cir.8/18/99), 740 So.2d 240.
During Allen's trial, the trial court conducted a "free and voluntary" hearing at which the detectives who worked on the case testified. Allen made several statements while in custody; however, the prosecution only introduced Allen's recorded confession of the crime to Detectives Mark Nappier and Quentin Holmes.
On the day of the confession, Detective Nappier and another officer asked to speak with Allen. After information regarding the police investigation was revealed, Allen decided to confess in light of that overwhelming evidence. Detective Holmes was brought into the room and again read Allen his Miranda rights prior to Allen's confession. The officers testified that Allen agreed to waive those rights.[3]
On appeal, Allen alleges that two coercive statements were made during his interrogation by police that coerced him into this final confession. The first statement was made by Detective Nappier. Detective Nappier admitted he told Allen that if he hoped to have any chance of spending time with his son outside of prison, he needed to be honest. According to Detective Nappier's trial testimony, the statement was not to coerce the defendant. When queried as to why he made the statement to the defendant, Detective Nappier further testified, "I just felt that was the best thing for him to do."
The other statement was made by Detective Thomas Rhodes in the first interview that Allen gave to police after his arrest. In that interview, Detective Rhodes told Allen that if the case went to trial, he faced the death penalty. Detective Holmes also admitted that in a pre-confession interview, he also mentioned the death penalty to Allen in order to educate the defendant on the differences between possible charges.
After hearing the testimony of the detectives, the trial court ruled that considering the totality of the circumstances, Allen's statements were freely and voluntarily given. According to the trial judge, the statements made by the officers regarding the defendant's son and the death penalty could be considered as musings, not beyond what the defendant could have concluded for himself. We agree.
*1258 Allen does not contend that he was not advised of or failed to understand his rights. Indeed, Allen was twice advised of his rights prior to confessing, and had been advised of his rights numerous times in pre-interview statements. A clear waiver of those rights exists on this record. Moreover, statements by police to a defendant that he would be better off if he cooperated are not "promises or inducements designed to extract a confession." State v. Petterway, 403 So.2d 1157, 1160 (La.1981); State v. Dison, 396 So.2d 1254 (La.1981). The fact that Allen would not be free to see his son while in prison is an obvious fact which Allen would have known. Further, this court has held that any discussion of the penalties for the different grades of homicide are superficial when not done in a threatening manner. Here, the officers testified that they told him of the death penalty to educate Allen on the different grades of offenses. Allen presented no contrary evidence. Thus, the trial court was free to accept that testimony as credible. With the great discretion granted to the trial court in determining the free and voluntary nature of a confession, we find no error in the admission of Allen's confession into evidence.
Excessive Sentence
Allen finally submits that his imposed sentence is constitutionally excessive because the sentence imposed is grossly disproportionate to the crime allegedly committed and represents nothing more than the needless imposition of pain and suffering.
It is the legislature's prerogative to determine the length of a sentence imposed for the crimes classified as felonies, and the courts are charged with applying those punishments unless they are found to be unconstitutional. State v. Armstrong, 32,279 (La.App.2d Cir.9/22/99), 743 So.2d 284, writ denied, 99-3151 (La.4/7/00), 759 So.2d 92. The decision to assess mandatory life sentences is within the authority of the legislature. State v. Armstrong, supra. Moreover, the judiciary should afford great deference to the legislature's determination of an appropriate minimum sentence. State v. Ruffins, 32,870 (La.App.2d Cir.12/10/99), 748 So.2d 614. The argument that the mandatory life sentence for second degree murder is a violation of the prohibition against excessive punishment in the Louisiana Constitution has been repeatedly rejected. State v. Roberson, 40,809 (La.App.2d Cir.4/19/06), 929 So.2d 789; State v. Thornton, 36,757 (La.App.2d Cir.01/29/03), 836 So.2d 1235, writ denied, 03-0861 (La.10/31/03), 857 So.2d 474; State v. Koon, 31,177 (La.App. 2d Cir.02/24/99), 730 So.2d 503; State v. Davis, 31,711 (La.App.2d Cir.3/31/99), 732 So.2d 612, writ denied, 99-3114 (La.5/5/00), 761 So.2d 539.
In order to overcome the legislative mandate, there must be clear and convincing evidence that the defendant is exceptional or that, because of unusual circumstances, he is the victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense and the circumstances of the case. State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672.
Where there is a mandatory sentence, there is no need for the trial court to justify, under Article 894.1, a sentence it is legally required to impose. State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219; State v. Hill, 40,023 (La.App.2d Cir.9/21/05) 911 So.2d 379; State v. Koon, supra.
*1259 Although not required, the trial judge in this case articulated reasons why this sentence was appropriate for Allen in addition to considering that the mandatory sentence was appropriate and individualized to this defendant. During the sentencing hearing, the victim's father made an impact statement outlining how the family, including the victim's four sons, suffered since losing their loved one. In reviewing the sentence, the trial judge found that the defendant had two adjudications[4] as a juvenile and that he served time for these offenses. The trial judge noted he looked at the facts of the case and found the crime to be a very violent one caused by the defendant's desire not to go to jail. The judge outlined the factors he considered including whether the defendant's criminal conduct caused or threatened serious harm, whether the defendant contemplated the fact that his actions would cause serious harm, whether the defendant acted under strong provocation, and whether the victim induced or facilitated the crime. All of these questions were answered against the defendant. The judge found that the defendant has a background of violent crimes and that he would likely turn to crimes of violence if released prior to serving the entirety of his life sentence. The court also found that imprisonment of the defendant would not entail an excessive hardship on his dependents.
According to the trial judge, aggravating circumstances present in this case were the fact that the motive for the premeditated murder was to escape jail (time) for a battery offense, the defendant's violent criminal history, and undue risk that the defendant would commit another crime if released on probation or parole. The court also found the defendant to be in need of correctional treatment in a custodial environment, and that a lesser sentence would deprecate the seriousness of the crime.
We affirm the imposed mandatory sentence. Allen neither argued nor provided any evidence to show that he is exceptional or that there were unusual circumstances not considered in this case. The trial judge meticulously evaluated whether the life sentence was appropriately tailored to this defendant and found the mandatory life sentence appropriate. The violent and heinous nature of the crime justifies the mandatory life sentence which is meaningfully tailored to the culpability of this offender, the gravity of the offense, and the circumstances of the case. The sentence is affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] The stipulated testimony of the mother of Allen's son confirmed that he brought these items to her home.
[2] The evidence also supports the conviction under the armed robbery murder theory. Allen confessed that he robbed someone shortly after the murder. Additionally, it would have been reasonable for the jury to conclude that Allen killed (used force against) Brown to prevent her seeing and objecting to his departure with the funds and her vehicle which the jurisprudence considers to have been under her control. See Reporter's Comment La. R.S. 14:64. Louisiana jurisprudence does not distinguish between the armed robbery which occurs before the killing of the victim and the robbery of the victim whom the defendant has already killed. State v. Goodley, 01-0077 (La.6/21/02), 820 So.2d 478. In such a case, the evidence supports the conclusion that the murder facilitated the armed robbery and formed part of one continuous transaction. See State v. Goodley, supra; State v. Nelson, 459 So.2d 510 (La.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 322 (1985).
[3] The record also shows that Allen had also given pre-confession interviews. The officers testified that on each occasion, Allen indicated he understood his rights and wished to waive them and discuss the matter with the detectives. During those visits, the officers observed that Allen did not appear to be under the influence of any substances and appeared to understand his rights.
[4] The record shows that at age 13, Allen was charged and adjudicated guilty for the crimes of oral sexual battery and battery upon a school teacher and was committed for a period not to exceed his 20th birthday (oral sexual battery) and 6 months (battery).