DREW, J.
 

 |,Edward L. Harris appeals his conviction for malfeasance in office, La. R.S. 14:134, claiming insufficiency of evidence. We affirm in all respects.
 

 After over two decades as the mayor of Richwood, he was defeated for reelection. He set a trap for the new administration: no cooperation; no money and no employees. He refused to provide information or access to the incoming mayor.
 

 During the last eight days of his term, the defendant:
 

 • terminated all employees;
 

 • plundered the town’s general bank account; and
 

 • overdrew the account by $26,000.
 
 [1]
 

 He was sentenced to five years at hard labor, suspended, with five years of supervised probation, including restitution of $65,360 for the town.
 

 OVERVIEW
 

 The bill of information charges that the defendant, between April 1 and June 30, 2008, did willfully and unlawfully commit malfeasance in office, contrary to the provisions of La. R.S. 14:134. In its amended bill of particulars, the state outlined four specific instances of malfeasance.
 
 [2]
 

 | .TESTIMONY
 

 At trial, the current Richwood Mayor, Steve B. Hunter, testified that:
 

 • he previously served as alderman and mayor pro tempore, prior to taking office as mayor on July 1, 2008;
 
 [3]
 

 • the Board of Alderpersons (“BOA”) enacted town ordinances, upon the mayor’s recommendation after review for legality by the town’s attorney;
 

 • as mayor pro tem, he had functioned as liaison between the defendant and the BOA for about four years before taking office as mayor;
 

 • three of the five BOA members were required for a quorum;
 

 • the mayor could veto any items passed by the BOA, but a vote of more than three board members could override the mayor’s veto;
 

 • after his election, he stayed on the BOA before taking office as mayor;
 

 • the BOA received a packet of proposed ordinances before meetings;
 

 
 *1250
 
 • prior to the contested BOA meeting on April 17, 2008, he did not recall receiving a copy of the policy or procedures manual to be amended;
 

 • he was 17 minutes late for the BOA meeting at issue, by which time three ordinances had already been adopted;
 
 [4]
 

 | a* he voiced opposition to the just-approved amendment authorizing severance payments;
 

 • he complained of having had no opportunity to review the ordinance regarding vacation and sick leave, and he further noted his opposition to making the may- or’s position full-time;
 

 • he believed the policy regarding nepotism had been proposed because of untrue rumors that his relatives would be hired to help run the town;
 

 • he did not oppose making the mayor’s job full-time, believing that he could serve as mayor, even if it meant leaving his present employment;
 

 • after election, but before taking office, he visited the offices in an unsuccessful attempt to orient himself with day-to-day operations;
 
 [5]
 

 • he went to a branch bank used by the town, but was told he would have to visit the downtown branch for the information, which he did not do;
 

 • early on the morning of July 1, 2008, his first day as mayor, he met with Tim Green, the accountant he had chosen as the town’s fiscal officer;
 

 • later that morning, a bank representative advised him that the town’s general account was overdrawn;
 

 • no employees were at work that day, as they had all been terminated;
 

 • he had previously spoken with some of the employees about working with his administration, but he never received any response from them;
 

 • he had not told any town employee that he would replace them;
 

 • his wife voluntarily assisted with answering the town’s telephone;
 

 • Richwood Correctional Center, a vendor of the town, advanced funds which enabled him to meet the town’s immediate financial obligations;
 

 14* as monies from sales taxes and other revenue streams began coming into the town’s coffers, the town’s fiscal emergency ultimately ended;
 

 • a new bank account was set up for the town’s general funds;
 

 • the overdrawn account was untouched by his administration;
 

 • unsuccessful attempts were made to collect the withdrawn monies;
 

 • immediately upon taking office, a recall effort was started;
 

 • on the first try, not enough signatures were gathered;
 

 • the second effort was successful and he resigned on October 17, 2008;
 
 [6]
 

 
 *1251
 
 • a special election was called six months after his resignation;
 

 • he ran again and was reelected;
 

 • over two years into his term, the ordinance relating to benefits was still on the books;
 

 • he stopped payment on the checks that had been issued to the town employees because the account was already overdrawn;
 

 • he was not aware of any overdraft protection agreement for the town;
 

 • it was more than two years before he filed a lawsuit against the defendant (who had by then qualified for election as an alderperson) to recover monies improperly paid to the defendant and former employees;
 

 • he did not file suit against any employees who received the payments;
 

 • he believed it was his responsibility to attempt recovery of the funds;
 

 • he acknowledged that, upon resigning after his recall, he received payment for vacation and sick leave under the new policies; and
 

 • he justified receiving the benefits, since the law had not been rescinded.
 
 [7]
 

 | ¡¡Shirley Henderson, former fiscal officer for the Town, testified that:
 

 • she worked six years for the town, reporting directly to the defendant;
 

 • her duties included accounts payable and payroll;
 

 • her employment ended on June 24, 2008;
 

 • she identified a June 23, 2008, letter, received from the defendant that terminated her and advised of her eligibility for severance pay;
 

 • she accepted severance pay of $14,587.91 in 11 checks, each check being signed by the defendant on her last day of work;
 
 [8]
 

 • she identified a printout of transactions for the town’s general cash fund advance, the document reflecting a negative balance;
 

 • she turned everything associated with her employment over to the defendant on her last day, and did not know who wrote the later checks;
 

 • anyone accessing the system could see that the account was overdrawn;
 

 • she used the amended policy manual to ascertain what each employee was due;
 

 • she was head of the payroll department and her knowledge was limited to only that department (she did not handle accounts receivable);
 

 • Her one conversation with Mayor-Elect Hunter led her to believe that he would be bringing in a “new team,” meaning no job for her;
 

 • Hunter had asked her to return the severance pay, but she knew of no lawsuits filed against her for the return of the monies;
 

 • she was interviewed by the state police in connection with the matter, but she had not been charged with anything; and
 

 • she received two letters from the defendant, each purporting to accept $52,000, one for severance pay and the other for vacation pay.
 
 [9]
 

 IfiLeo Kelly testified that:
 

 • he was an alderman with the Town of Richwood for over 19 years;
 

 
 *1252
 
 • he was first elected when the defendant was mayor of the town, and they had a good working relationship, though they occasionally differed;
 

 • he recalled the April 2008 meeting that amended the policy manual;
 

 • the BOA received the proposed ordinances a few days prior to the meeting, but they did not receive a copy of the manual to make comparisons of the current policy and the proposed changes;
 

 • he never saw the policy manual during his 19 years as alderman;
 

 • he voted against the ordinance, which was not discussed;
 

 • the defendant always had employment outside of his mayoral duties;
 

 • the defendant could not have been considered a full-time mayor;
 

 • he knew of no efforts by the defendant to comply with the normal practice of amending the town budget for funding increased expenses;
 

 • only the BOA could enact ordinances, but the mayor had veto power;
 

 • he moved to table the matter for one week for additional time to review the proposed ordinances, but his motion failed; and
 

 • the contested ordinances had not been amended as of the date of trial.
 

 LaWanka Roberts testified that:
 

 • she was the former appointed Chief of Police, and she worked for the town from August 2007 to June 30, 2008;
 

 • she received a letter from the defendant dated June 23, 2008, informing her that she was no longer a part of the administration and that she could expect to receive payment .for her unused vacation;
 

 • she believed she would not be hired by the new administration;
 

 • the defendant gave her the final checks for salary and severance pay;
 

 • the defendant requested that she hold the checks, but she did not believe that would be a good idea, because of the incoming administration;
 

 |7* she deposited the checks into her account but they were returned NSF;
 

 • she felt entitled to severance and vacation pay; and
 

 • she finally received the portion of the monies earned as her regular salary, but she did not pursue the return of the other funds.
 

 Serphronia Miller testified that:
 

 • she was the town’s accounts receivable clerk for over five years, ending June 25, 2008, during which time she reported directly to the defendant;
 

 • she was responsible for taking in the town’s revenue;
 

 • she received notice that she would no longer be employed by the town, but that she would be entitled to severance pay;
 

 • Hunter never approached her regarding her future employment but she believed, because of information disseminated during the election, that she would no longer have a position with the town;
 

 • her checks for severance and unused vacation totaled $6,763.65;
 

 • the checks were deposited and paid in full;
 

 • she and Ms. Henderson were responsible for keeping the town’s accounting system on QuickBooks, the transaction ledger, which clearly showed an overdrawn account as of June 30, 2008;
 

 • she did not have authorization to write checks for the town;
 

 • she felt entitled to the payments received after her employment ended;
 

 • the payments to her were made because of a BOA policy; and
 

 • no one ever requested that she return the money.
 

 Anchitta Perkins testified that:
 

 
 *1253
 
 • over a period of six years, she worked in several positions for the town, including dispatcher, administrative assistant to the chief of police, dispatch supervisor, tax supervisor, and clerk of court;
 

 • her last day of work came at the end of June 2008;
 

 • she accepted severance and unused vacation pay;
 

 Is* she never spoke with Mayor Hunter regarding her future employment;
 

 • she got several checks totaling $4,952.59, all of which were deposited, but only her $625.79 payroll check ultimately cleared;
 

 • she spoke with Hunter and LSP Trooper Almond about the checks;
 

 • the trooper said she might get paid later for the dishonored checks; and
 

 • she felt entitled to the monies because the BOA had enacted changes to the policy and procedure manual.
 

 Jay Nolen, the town attorney, testified that:
 

 • he worked in that capacity from mid-1997 to July 1, 2008, then again from October 2009 through the date of trial;
 

 • when he began his employment with the town, there were no monies to pay him so he agreed to work until such time that he could be paid;
 

 • at the end of the defendant’s term, he was paid a $22,000 lump sum;
 

 • the previous annual leave policy was “use it or lose it;”
 

 • the policy enacted in April of 2008 allowed for accumulation of leave;
 

 • when reviewing the policies, Mr. Nolen noted that he was “concerned” about the severance pay provision and he also had general concerns about the vacation and sick leave policy;
 

 • severance pay cannot be paid to public officials or public employees;
 

 • he told the defendant in a phone call that severance pay was illegal;
 

 • he suggested capping sick and vacation pay at one year;
 

 • when he got the next draft, all severance pay language had been deleted;
 

 • he explained to one alderman why private employees could receive severance payments and public employees could not;
 

 • he did not recall receiving the final documents before the BOA meeting;
 

 13* in discussing the proposed changes with the defendant, he did not discuss whether retroactive payments could be made to town employees for leave accumulated prior to the amended policy being adopted; and
 

 • he admitted not researching the issues presented with the proposed draft ordinances and policy revisions.
 

 Mike Rhymes testified that:
 

 • he is a lawyer serving as human resources director for Monroe;
 
 [10]
 

 • different rules apply to handling public versus private funds;
 

 • the Louisiana Constitution prohibits donation of public funds;
 

 • for this reason, there is no authority for the payment of severance pay in the public sector because it is generally thought of as a donation;
 

 • it is permissible to pay public sector employees for accumulated sick leave or vacation time, if done in accordance with a written policy;
 

 • such a policy could not be made to apply retroactively;
 

 • Louisiana jurisprudence has established the parameters for a “non donation” and
 
 *1254
 
 the analysis turns on the “gratuitous intent” of the parties;
 

 • he was consulted by Gary Jessie for possible representation in obtaining payments for issued checks that had been dishonored by the bank; but
 

 • he ultimately declined to represent Jessie.
 

 Yvette Griffin testified that:
 

 • she had previously been employed by the Town of Richwood from 1992 through June 2008, when the defendant lost his reelection bid;
 

 • she received payment as a part of a severance package that was provided based on a BOA ordinance and policy that had been adopted;
 

 • she felt entitled to the money and she had not been asked to return it;
 

 |in* she had been interviewed by the state police but not arrested;
 

 • she drafted the disputed ordinance and a personnel manual;
 

 • she started working on the manual in 2007;
 

 • she modeled the proposed policy manual changes relative to sick and vacation pay after several other policy manuals, including that of the state, the Monroe police, and others from the Internet;
 

 • she had served the town as bookkeeper, accountant, and city manager;
 

 • from 2000-2006, she was part-time;
 

 • from 1992-1998 and 2007-2008, she was full-time;
 

 • the check she received was signed by the defendant;
 

 • she was unsure of her entitlement to payment for unused vacation time;
 

 • she was not sure how her total severance package was structured, as to whether or not it included sick time, vacation, or other hours;
 

 • she received a letter from the defendant in late June 2008 indicating that she would be terminated, and that a new administration was taking over;
 

 • she had spoken to the incoming mayor, but her status was still unclear;
 

 • she drafted the severance pay provisions on her own;
 

 • the employee turnover rate for the town was high, and the purpose of updating the policy manual relative to sick leave and vacation pay was to provide incentives for employees to stay with the town;
 

 • she was unsure if the defendant had made any suggestions or corrections during the drafting process;
 

 • she did not write ordinances as that was usually done by the defendant, although she would review the drafts for errors and make suggestions;
 

 • she and the defendant thought that they could draft the town’s ordinances as they choose, as long as the policies were approved by the board;
 

 |n* the town attorney, Jay Nolen, was consulted on the policy and she sat in on a conference call with him and the defendant;
 

 • she recalled Nolen saying, “You can do that as long as Ed makes sure it goes before the board,” and she remembered Nolen stating that there should be a cap on the severance pay for budgetary reasons;
 

 • she did not contemplate, when she drafted the revised policy manual, that a large number of employees would leave at one time;
 

 • the town had various accounts that were a part of the general fund, and if the account from which the checks were drawn did not have enough money, the other accounts would be used as overdraft protection;
 

 • one account was dedicated to paying sewer system expenses; and
 

 
 *1255
 
 • she did not become aware of attorney general opinions advising against severance pay until after she had left her employment with the town.
 

 Edward Harris, the defendant, testified that:
 

 • he had been the mayor of Richwood for approximately 24 years;
 

 • the town had been stable and sound financially since 2006;
 

 • revenues from video bingo helped to revive the town financially;
 

 • the process for revisions to the policy manual began in 2005;
 

 • the person assigned that task was laid off due to lack of funding;
 

 • thereafter, Ms. Griffin was charged with drafting the revisions;
 

 • he delegated qualified people to make the revisions;
 

 • he presented the proposed policy changes in draft form to Mr. Nolen;
 

 • the draft included a policy dealing with severance pay;
 

 • Nolen indicated that the policy looked good, but he had some problems with the vacation portion as well as the severance package;
 

 112* concerning vacation pay, Nolen recommended that the amount of pay be limited, and a limitation was included in the final policy draft;
 
 [11]
 

 • Nolen did not tell him that any provisions of the proposed policy would be prohibited, but he did indicate some concerns;
 

 • the attorney never gave a legal opinion about the proposed policy;
 

 • had he been told that something was legally prohibited, he would not have included that provision in the policy revisions;
 

 • the BOA was responsible for passing the ordinances or laws;
 

 • the policy revisions could not be made without BOA approval;
 

 • to his knowledge the same policies were still in effect;
 

 • he supported the changes because the town had the monies and it had a good staff who deserved a reward for their service, since he understood that the new Mayor would be terminating the present staff;
 

 • the checks issued to the employees should not have “bounced”;
 

 • there were revenue streams continuously being deposited into the account that should have prevented the checks from being returned NSF, unless someone interfered with the normal process, meaning that the usual direct deposits would not be placed into the account;
 

 • he had not taken a vacation during his entire tenure;
 

 • he believed the payment was consistent with the policy manual;
 

 • he acknowledged that a lawsuit to recover the payments to him and other had been filed against him by the Town of Richwood;
 

 • there had been policy manual revisions between 1993 to 2008 with regard to travel vouchers, meals, sick leave, and annual leave time;
 

 • there were several undedicated accounts from which outstanding checks could have been paid, and when he issued the check on the accounts, it was his intention that they all be paid;
 

 • when these checks were presented, the bank was aware that monies would be transferred into the account within a short period;
 

 
 *1256
 
 |1S* the bank should have covered the checks if the money was not available when the checks were presented;
 

 • had the checks been presented on Tuesday, there was direct funding that would have been available on Wednesday or Thursday at the latest, and it would be anywhere from $15,000 to $5,000;
 

 • in response to the state’s point that the account was overdrawn in excess of $35,000, he stated that sufficient monies would have been deposited into the account on the first three days of the month;
 

 • he had initially told the state police investigator that there was a possibility that the checks would overdraw the checking account, but he did not believe it would necessarily have to happen, depending upon when the checks were presented to the bank for payment; and • the town had overdraft protection
 
 [12]
 
 which should have covered any shortages, as had occurred in the past.
 

 DISCUSSION
 

 The defendant asserts that the state failed to prove essential elements of the charged offense in that the evidence did not show that he intentionally violated any law or performed any duty in an unlawful manner.
 

 The state responds that it proved that the defendant breached the legal duty imposed upon him under La. Const. Art. VII, § 14, and La. R.S. 42:1461, by committing certain unlawful acts including the issuance of worthless checks in violation of La. R.S. 14:71.
 

 Our law on reviewing sufficiency of evidence is well settled.
 
 [13]
 

 
 *1257
 
 114The law governing this particular inquiry is clear.
 
 [14]
 

 11sThere is sufficient evidence here to justify this conviction. The four unlawful acts alleged by the state can be summarized as follows:
 

 A. The Scheme
 

 The defendant wanted to create havoc in and paralysis of the town, functionally and financially. The target of the dirty trick was the new mayor; the victims were the citizens of Richwood.
 

 
 *1258
 

 B. Unlawful Severance Checks
 

 The jury chose to believe the testimony of the town’s attorney that (1) he advised the defendant of the illegality of the severance payments; and (2) his pre-BOA meeting documentary package did not include the proposed severance language. Defendant takes refuge in the fact that an ordinance was passed and unchallenged when the checks were cut. It is patently absurd that a mayor with his years of service could believe these checks to be legal.
 

 IjfiC.
 
 Issuing Worthless Checks
 

 This is the smoking gun. The Quick-Books ledger and the NSF checks settle this issue beyond doubt. If nothing else, on his last day in office, when the defendant took $52,000 for himself, it was crystal clear that the checking account was over $25,000 in the red, with other obligations coming due.
 

 D. Depleting All Proceeds of the Town
 

 The fiscal manager of the town testified, and the jury apparently believed, that all of the town’s accounts, taken together, could not have covered the checks cut by the defendant in June of 2008.
 

 Taken together, these specific acts prove the criminality of the defendant’s actions. He intended to place his successor in a desperate situation: insufficient checks, no available funds, and no employees. His malice outweighed his solemn oath to support and defend the law.
 

 The state clearly proved that the defendant committed malfeasance.
 

 DECREE
 

 The defendant’s conviction and sentence are AFFIRMED.
 

 [1]
 

 . Included among the improper checks were 26 separate checks payable to himself, totaling $52,000, on June 30, 2008, his last day of office. All of his checks cleared the bank that same day. Other recipients of this unlawful public largesse were not so fortunate, as some checks were never paid.
 

 [2]
 

 . The amended bill of particulars alleged that the defendant:
 

 A. Engaged in a scheme by promoting and encouraging members of the Richwood Town Council to pass certain illegal resolutions and ordinances designed to directly benefit the Defendant by providing for an unlawful severance payment to the Defendant and/or to otherwise deplete all funds in the bank account for the Town of Richwood;
 

 B. Did issue and cause to be issued by employees of the Town of Richwood, checks for payment of unlawful severance and annual and sick leave payments to the Defendant and other employees and officials of the Town of Richwood;
 

 C. Did issue and cause to be issued by employees of the Town of Richwood, checks for payment from Town funds when he knew that there were insufficient funds in the Town’s checking account to cover the amounts of the checks issued;
 

 D. Did cause all funds belonging to the Town of Richwood to be depleted from the Town's checking account by expenditures which were not contained in the Town’s annual budget.
 

 [3]
 

 .Hunter became mayor after the defendant had served as mayor for 24 years.
 

 [4]
 

 .Hunter was aware of the time of the contested meeting, but indicated that he was late and therefore not certain whether the ordinances had been properly passed. Within 17 minutes, the following occurred, according to the minutes: opening of meeting, prayer, pledge of allegiance, roll call, discussion of topographical surveying, approval of past minutes, then the adoption of three separate ordinances, involving:
 

 • prohibition against nepotism;
 

 • requirement that the mayor's job be full-time, subject to criminal penalties; and
 

 • policy manual changes, including the authorization for severance payments and authorization for payments for unused vacation and sick time, which had previously been on a “use it or lose it” basis.
 

 In addition, Alderman Leo Kelly testified that he made a motion to table the policy manual changes, which motion failed.
 

 [5]
 

 . On June 24, 2008, the defendant wrote to refuse him the requested information.
 

 [6]
 

 . Alderman Simeon Profit assumed the office of mayor, appointing the defendant as his assistant.
 

 [7]
 

 . And, presumably, since the benefits paid to him were not retroactive.
 

 [8]
 

 . She also wrote checks on that date to Clarissa Holmes, Serphronia Miller, and Anchitta Perkins, as she was informed that these people would not be returning to work.
 

 [9]
 

 .The letter acknowledging receipt of vacation pay was signed; the other was not, leading to an inference that a total of $52,000 was paid, amounting to a full year's salary.
 

 [10]
 

 . Rhymes was accepted by the court as an expert in the field of "employee compensation particularly as applies to government entities.”
 

 [11]
 

 . The checks he took on his last day in office amounted to $52,000, shown as payment for unused vacation time accumulated during his 24 years of service.
 

 [12]
 

 . The alleged overdraft protection raises the question as to why some of the checks were returned NSF.
 

 [13]
 

 . The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Carter,
 
 42,894 (La.App.2d Cir. 1/9/08), 974 So.2d 181,
 
 writ denied,
 
 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833,
 
 writ denied,
 
 2009-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Eason,
 
 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685,
 
 writ denied,
 
 2009-0725 (La.12/11/09), 23 So.3d 913;
 
 State
 
 v.
 
 Hill,
 
 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758,
 
 writ denied,
 
 2007-1209 (La.12/14/07), 970 So.2d 529.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Speed,
 
 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582,
 
 writ denied,
 
 2009-0372 (La.11/6/09), 21 So.3d 299. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency.
 
 State v. Speed, supra.
 

 
 *1257
 
 Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1);
 
 State v. Lindsey,
 
 543 So.2d 886 (La.1989), ce
 
 rt. denied,
 
 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990);
 
 State v. Davies,
 
 35,783 (La.App.2d Cir.4/5/02), 813 So.2d 1262,
 
 writ denied,
 
 2002-1564 (La.5/9/03), 843 So.2d 389, citing La. R.S. 14:10(1).
 

 Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1);
 
 State v. Draughn,
 
 2005-1825 (La.1/17/07), 950 So.2d 583,
 
 cert. denied,
 
 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007).
 
 See also State v. Allen,
 
 41,548 (La.App.2d Cir. 11/15/06), 942 So.2d 1244,
 
 writ denied,
 
 2007-0530 (La.12/7/07), 969 So.2d 619.
 

 The determination of whether the requisite intent is present in a criminal case is for the trier of fact.
 
 State v. Huizar,
 
 414 So.2d 741 (La.1982);
 
 State v. Hill, supra.
 
 In reviewing the correctness of such a determination, the Court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense.
 
 Jackson v. Virginia, supra; State v. Huizar, supra.
 

 [14]
 

 . La. R.S. 14:134 Malfeasance in office:
 

 Malfeasance in office is committed when any public officer or public employee shall:
 

 (1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer or employee; or
 

 (2) Intentionally perform any such duty in an unlawful manner; or
 

 (3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him, or to perform any such duty in an unlawful manner.
 

 Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public employee shall be deemed to be a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.
 

 Whoever commits the crime of malfeasance in office shall be imprisoned for not more than five years with or without hard labor or shall be fined not more than five thousand dollars, or both.
 

 Under Louisiana law, prosecutions for malfeasance in office as defined by La. R.S. 14:134(1) and 14:134(2) presuppose the existence of "a statute or provision of the law which delineates an affirmative duty upon the official.”
 
 State v. Perez,
 
 464 So.2d 737, 741 (La.1985);
 
 State v. Schwehm,
 
 98-1599 (La.3/19/99), 729 So.2d 548. This duty "must be expressly imposed by law upon the official because the official is entitled to know exactly what conduct is expected of him in his official capacity and what conduct will subject him to criminal charges.”
 
 State v. Perez, supra.
 
 When a public official takes the oath of office contained in La. Const. Art. 10, § 30, swearing to uphold the laws of Louisiana, that oath imposes upon him a specific duty not to obstruct or interfere with the execution of those laws.
 
 State v. Perez, supra; State v. Authement,
 
 532 So.2d 869 (La.App. 1st Cir. 1988).
 

 La. R.S. 14:71, issuing worthless checks, provides in pertinent part:
 

 A. (l)(a) Issuing worthless checks is the issuing, in exchange for anything of value, whether the exchange is contemporaneous or not, with intent to defraud, of any check, draft, or order for the payment of money upon any bank or other depository, knowing at the time of the issuing that the offender has not sufficient credit with the bank, or other depository for the payment of such check, draft, or order in full upon its presentation.