799 So.2d 1234 (2001)
STATE of Louisiana, Appellee,
v.
Fruquan HOPKINS a/k/a Harum Abdul Sharif, Appellant.
No. 35,146-KA.
Court of Appeal of Louisiana, Second Circuit.
November 2, 2001.
*1235 Amy C. Ellender, Counsel for Appellant.
Richard P. Ieyoub, Attorney General, Jerry L. Jones, District Attorney, George D. Ross, Assistant District Attorney, Counsel for Appellee.
Before NORRIS, WILLIAMS and CARAWAY, JJ.
WILLIAMS, J.
The state charged defendant, Fruquan Hopkins a/k/a Harum Abdul Sharif, with the July 9, 1999 second degree murder of David L. Parker, a violation of LSA-R.S. 14:30.1. Defendant waived a trial by jury and was found guilty as charged after a bench trial. The court imposed the mandatory sentence of life imprisonment without the benefit of probation, parole or suspension of sentence. The trial court denied timely motions for judgment of acquittal and new trial. On appeal, defendant contends the trial court erred in denying the motion to suppress his confession and the evidence, with the confession excluded, was insufficient to support the finding of guilt beyond a reasonable doubt. Finding that neither of these assignments has merit, we affirm.

FACTS
On July 9, 1999, West Monroe Police Department Detective Barry Teague took charge of the investigation of the fatal shooting of David Parker. The police developed defendant as a suspect and learned he was incarcerated in Baltimore, *1236 Maryland, on an unrelated charge. Detectives Teague and Kirk Fuqua interviewed defendant in Maryland. After a one- to two-hour interview, which was not recorded, defendant confessed to Parker's murder. He then gave a recorded confession.
Defendant admitted that he shot the victim three times with a .380 pistol. The killing occurred while the victim was showing an apartment for rent to the defendant. Defendant stated details which would have been known only to the perpetrator, e.g., he pulled keys and money from the victim's pocket. The investigators found the victim's pocket had been pulled out. One of the victim's neighbors testified that he heard two shots close together then a delayed third shot. Defendant described the shots in the same manner, stating that he initially shot twice when the victim used a racial slur, and then fired the third shot when the victim reached for an object. The defendant's friend, Kevin Williams, testified that defendant gave him a bloody shirt on the day of the homicide. Williams gave the shirt to the police. Louisiana Crime Lab personnel identified the victim's blood found on the gear shift of the victim's vehicle. Defendant admitted he fled the scene in the victim's vehicle. The evidence that the victim was shot in the back of the head while kneeling, after defendant pushed him against a wall and starting robbing him, overcomes any claim of self-defense or justification.

DISCUSSION
Defendant contends the statement he made to investigators in Baltimore, Maryland, was not given freely and voluntarily. He urges his confession was unlawfully induced by Officer Teague who, defendant claims, told defendant that if he told the truth, then manslaughter could be an option and that the death penalty was the consequence of a conviction for first degree murder.
At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Rogers, 476 So.2d 942 (La.App. 2d Cir.1985). A trial court's findings following a free and voluntary hearing are entitled to great weight and will not be disturbed unless unsupported by the evidence. State v. Durr, 28,197 (La.App.2d Cir.6/26/96), 677 So.2d 596; State v. English, 582 So.2d 1358 (La.App. 2d Cir.), writ denied, 584 So.2d 1172 (La.1991).
Although promises or inducements will void a defendant's confession, State v. Serrato, 424 So.2d 214 (La.1982); State v. Jackson, 414 So.2d 310 (La.1982), a mild exhortation to tell the truth, or an indication that if the defendant cooperates the officer will "do what he can" or "things will go easier" will not negate the voluntary nature of a confession. State v. Petterway, 403 So.2d 1157 (La.1981); State v. Jackson, 523 So.2d 251 (La.App. 2d Cir.), writ denied, 530 So.2d 565 (La.1988), and authorities therein.
Detective Teague testified that he and Detective Kirk Fuqua went to Baltimore to interview defendant. They advised him of his rights. Defendant signed a form acknowledging that he understood his rights. Defendant appeared to understand his rights as they were explained to him. He did not appear to be on drugs or under the influence of any mind-altering substance at the time of his statement. He had been incarcerated for several days. He did not ask for a lawyer and never indicated that he wanted to cease the interview. The police made a recorded statement after defendant admitted that he committed the homicide.
Before defendant made the recorded statement, the detectives again informed him of his rights. The initial interview, *1237 before defendant finally confessed, lasted about one hour. The police did not specifically talk about the difference between manslaughter and "murder one" or two; the fact that murder one carried the death penalty was brought up "but not specifically." The police told defendant that if he told the truth then he might get a lesser charge, but they also informed him that the decision was not under their control.
Detective Fuqua testified that he knew defendant from a prior arrest on a marijuana charge. Detective Teague first advised defendant of his rights when they entered the interview room. Defendant paid attention while his rights were being explained and he seemed to understand. He was not under the influence of drugs or alcohol. Both the detectives and defendant signed the advice of rights form. Defendant never stated that he wanted to stop the interview or that he did not understand.
After the initial interview, which Detective Fuqua thought may have been only forty-five minutes in duration, the detectives again advised defendant of his rights. Defendant again signed a separate form indicating that he understood his rights. He agreed to provide a recorded statement. The officers did not make any promises of a light or special sentence or any promises to induce the defendant to make the statement.
Defendant was aware of the charge against him at the time of the interview. The Baltimore police had informed him of the charge, based on the information contained in the warrant. The detectives told defendant that telling the truth was better than lying. Fuqua did not recall any conversation about "having benefit of manslaughter charge" (sic). Defendant neither asked the officers to stop the questioning before he gave the recorded statement nor to allow him to speak to a lawyer.
At the very beginning of the confession, defendant said he understood his rights and was voluntarily making the statement. Defendant ended the confession by stating that he had not been forced to make a statement, the officers had not made any promises and he gave the statement freely.
The trial court found that defendant was not coerced into making the statement, he was not offered any improper inducements, threats or promises, and he acknowledged his understanding of his rights in writing. The court ruled that the tape recording of the confession and the transcript were admissible into evidence and denied the motion to suppress.
We find that the record in this case supports the trial court's finding that defendant freely and voluntarily gave his statement to the police. The police officers advised defendant of his Miranda rights twice. He understood them. He did not try to stop the interview, nor did he ask for a lawyer. Any discussion of the penalties for the different grades of homicide was superficial and was not done in a threatening manner. There were no promises that things would go better or that the charge would be reduced in exchange for a confession. Defendant agreed both before and after the interview that he had given his confession freely and voluntarily. This assignment lacks merit.
In his final assignment of error, defendant claims the evidence failed to show that he committed the offense. In the alternative, he contends the evidence shows that he shot the victim in self defense or alternatively, the verdict should have been manslaughter. The defense contends, without the confession in evidence, there is no proof of specific intent to kill or inflict great bodily harm at the *1238 time of the killing and the state's evidence does not exclude every reasonable hypothesis of innocence. The defense argues that when the victim, Parker, called defendant a "broke ass n____r" and reached into his pocket for a cellular phone, defendant thought his life was in imminent danger and shot twice to protect himself. Alternatively, the defense argues the verdict should be reduced to manslaughter because the victim's racial slur was sufficiently inflammatory to deprive defendant of self-control and cool reflection.
The standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471(La.1983); State v. Owens, 30,903 (La. App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
To convict this defendant of second degree murder the state was required to prove that he killed a human being while engaged in the perpetration of a robbery. LSA-R.S. 14:30.1.
In defendant's confession, he admitted that he told Tasha Pope he planned to rob somebody to get enough money to get a bus ticket back to Baltimore. Tasha suggested that he watch for "the landlord dude" on Friday, the day he collects the rent. She also told defendant the victim carried a gun. Tasha arranged for the defendant and the victim to meet. Defendant pretended to be interested in renting an apartment. Both Tasha and another woman were in the area at the time of the robbery/homicide. The other woman did not know about the robbery plan.
The victim told defendant he would have to pay two hundred dollars to move in. Defendant said he only had seventy-five dollars. The victim allegedly called defendant a "broke ass n____r." According to the defendant, he got mad, pulled him back and started to rob him. He reached in his pocket. "I thought it was the gun.... I shot him. I shot him the first time and he was like turned around and was shaking coming towards me so I shot him again. I grabbed the keys and he had like ten dollars in his pocket and I had just ran up out of there and got in the car and was gone."
We note under this scenario that defendant, as the aggressor who set the events in motion by beginning to rob the victim, cannot claim self-defense. LSA-R.S. 14:21. We further note that defendant admitted he shot the victim to complete the robbery, not in response to being called a derogatory name.
Defendant explained that he began the robbery by putting his gun against the victim's head while the victim was bent over the bathtub turning the water faucet. Defendant came up behind the victim and pushed him against a wall. The victim reached for his pocket when he heard defendant *1239 cock his pistol. At that point, defendant fired his first shot into the back of the victim's head. The victim stood up and moved toward defendant, who shot him again. Defendant took a set of keys and cash from the victim's pocket. Because the victim was still moving and trying to grab the defendant, the defendant shot him a third time. Defendant fled the scene in the victim's car, threw his pistol over a levee, took six or seven hundred dollars from an envelope in the car and later abandoned the vehicle.
Defendant walked to the house of his friend, Kevin Williams. Defendant did not say what had happened, but he had blood all over him. He told Williams to burn the bloody shorts and blue T-shirt. The weapon defendant used was a .380 Lorcin, chrome and black pistol.
It is well settled that a person cannot be convicted on his or her confession alone. State v. Calloway, 196 La. 496, 199 So 403 (1940); State v. Morgan, 157 La. 962, 103 So. 278 (1925). This court interprets this corroboration rule to require only that there be some evidence, besides the confession, that a criminal act was committed by someone. State v. Cutwright, 626 So.2d 780, 783 (La.App. 2d Cir.1993).
Officer Brian Tanner, West Monroe Police Department, testified that on July 9, 1999 he was dispatched to 303 Coleman in response to a "shots fired" call. When he arrived, he found a white male lying face down in a large pool of blood in the bathroom of an apartment. Tanner arrived at the scene within thirty seconds of getting the dispatch, which was probably ten minutes after the shots were fired.
Detective Barry Teague testified that he initially saw the victim's body lying face down, covered in blood, on the bathroom floor. Teague found a .380 shell casing on the floor between the victim and the door. Two other .380 shell casings were in the roomone was next to the victim and one was in the bathtub. These matters corroborate the defendant's confession that the first shot was fired while the victim was on his knees near the tub and that a total of three shots were fired.
The victim's left front pocket had been pulled out and there was blood on the inside of the pocket. This corroborates the defendant's confession that defendant took keys from the pocket and used a bloody hand to do so. There were several bloody shoe prints from someone leaving the scene. Teague took into evidence one vinyl floor tile bearing a bloody shoe print. The police also seized defendant's shoes after the Baltimore interview and delivered them to the crime lab. Defendant's driver's license was issued in Baltimore, Maryland. The victim's cell phone was used, after the homicide, in Monroe, Jackson, Mississippi and Baltimore. This shows defendant had access to the victim before the police arrived. The police also recovered a blue T-shirt from Kevin Williams' home. The prints from the shoes defendant was wearing at the interview were consistent with the bloody shoe prints at the homicide scene. Defendant said they were the same shoes.
Kevin Williams testified that he knows defendant by his full name and as "Red." On the day the landlord was killed, defendant went to Williams' house. Defendant had blood on his shirt. This fact tends to corroborate the defendant's confession that defendant was at the crime scene. Defendant gave his shirt to Williams in exchange for a clean one. Williams kept defendant's shirt in his closet and then turned it over to the police.
Eugene Savoy testified that he lived next door to the apartment where the homicide occurred. The victim, Parker, came over that day to collect the rent. A few minutes later, Savoy heard "tussling" *1240 inside the apartment. It sounded like something was banging against the wall. Then he heard two shots, followed by a long pause of possibly a minute, and then a third shot. This testimony corroborates defendant's statements in regard to the sequence and the timing of the shots and that he pushed the victim against the wall during the robbery. Savoy looked outside and saw the victim's car being driven away by an African-American, which corroborates defendant's statement that he left the scene driving the victim's car. Savoy walked to the apartment, saw the victim's body and called the police.
Detective Fuqua testified that the bloody shoe prints by the victim's body "looked rather unusual." During the interview, defendant said the shoes he was wearing were the same shoes he wore when he shot the victim. The T-shirt the police recovered from Mr. Williams had been washed and did not provide any evidence of the homicide.
Dr. Steven Hayne was accepted as an expert in forensic pathology, including the analysis of blood splatter evidence. He performed the autopsy on the victim. The body had a gunshot wound to the left back of the head, behind and at the level of the left ear. It was a near contact wound. The bullet traveled back to front and downward at a 30-degree angle. This wound would not have been immediately fatal. The second gunshot wound was to the back right side of the head. The bullet traveled from back to front and upward at a 20-degree angle. Again, this was a near contact gunshot wound which was fatal. The blood spatters on the bathtub indicated the victim was shot while his head was within one to two feet of the bathtub. The shots to the back of the victim's head were fired from a distance of 18 inches or less. The blood spatters indicated to Dr. Hayne that the shooter was standing behind and above the decedent while he was kneeling. These facts negate any claim that defendant was firing to protect himself. Rather, the evidence shows defendant executed the victim by firing from behind him.
The third gunshot struck the victim in the face, near the left side of the nose, and traveled across the face. It was not an immediately lethal or even incapacitating shot.
Detective Jackie Gilbert of the West Monroe Police Department collected evidence from the victim's car. The gear shift knob had blood on it. Six hundred dollars in cash was under a floor mat. This corroborates defendant's statement that he took a large amount of money from the car while he was bloodied from the murder, and that the victim was carrying a large amount of currency that day.
Michael Stelly, a forensic scientist at the North Louisiana Crime Lab, testified that he compared the prints from defendant's shoes and the bloody shoe prints found on the vinyl floor at the scene of the robbery/homicide. The print on the vinyl was "consistent" with defendant's left shoe, which corroborates the defendant's confession that defendant was present at the scene of the robbery-homicide.
Kendall Stracener, also an employee of the crime lab, was accepted as an expert in DNA analysis. He compared blood found on defendant's tennis shoe to a sample of the victim's blood. The blood on the shoe was consistent with the victim's blood. The chance that the blood from the shoe came from some other caucasian male was 51 trillion to one. Also, the blood on the gear shift knob was consistent with the victim's blood.

CONCLUSION
As stated above, the evidence shows defendant was in the apartment on a pretext and had the intent to commit an armed *1241 robbery. The victim was kneeling on the floor when he was shot from behind with a.380 pistol. The defendant took the victim's car keys and cellular phone and fled in the victim's car. Defendant took cash from the car and bought a bus ticket to Baltimore where he used the victim's cell phone. Defendant's claim that he reacted to a racial slur is merely a self-serving fabrication. The evidence shows that he shot for the purpose of perpetrating a robbery. Thus, after a thorough review of the record, we conclude that the evidence shows beyond a reasonable doubt that defendant executed the victim during an armed robbery, and thus, any rational juror could have concluded, beyond a reasonable doubt, that this defendant was guilty as charged of second degree murder. This assignment lacks merit.
Our error patent review disclosed none.

DECREE
For the above reasons, the conviction and sentence are affirmed.
AFFIRMED.