974 So.2d 157 (2008)
STATE of Louisiana, Appellee,
v.
Jerry L. WILLIAMS, Appellant.
No. 42,914-KA.
Court of Appeal of Louisiana, Second Circuit.
January 9, 2008.
Louisiana Appellate Project by Edward K. Bauman, for Appellant.
Paul J. Carmouche, District Attorney, William Jacob Edwards, Tommy J. Johnson, Assistant District Attorneys, for Appellee.
Before BROWN, PEATROSS & MOORE, JJ.
*159 PEATROSS, J.
Defendant, Jerry L. Williams, appeals from his convictions for second degree murder and" attempted second degree murder. On appeal, Defendant does not contest the sufficiency of the evidence to convict him; he raises issues concerning the admissibility into evidence of certain expert testimony and of the murder weapon. For the reasons set forth below, we affirm the convictions and sentences of Defendant.

FACTS
Ms. Sara Mims Payton lives in Shreveport in a home near the corner of Looney Street and Pierre Avenue. Ms. Payton's 24-year-old son, Alonzo Mims, also resided at Ms. Payton's house. On October 13, 2005, Ms. Payton and her son decided to go to a nearby grocery store. The two walked across the vacant wooded lot between her house and the store. After making their purchases, Ms. Payton and Alonzo started to walk back across the same vacant lot towards her home.
As they walked, they met Defendant, who was sitting on bricks in the vacant lot. Ms. Payton recognized Defendant because she had known Defendant and his family since before Alonzo was born. Defendant and his younger brother, Jason Williams, had been occasional visitors at Ms. Payton's home, and Defendant had been to Ms. Payton's house the night before when he retrieved a jacket that he had left there.
Ms. Payton spoke to Defendant, who spoke back to her. Defendant then began speaking with Alonzo. Ms. Payton kept walking toward her house while Alonzo spoke to Defendant. Ms. Payton then noticed another man she described as "squatting" behind a tree across from Defendant. Ms. Payton looked back toward her son, and, because he had the keys, she asked him to let her into the house. At trial, Ms. Payton testified:
He [Alonzo] turned toward me to answer me. When he turned towards me to answer me, that's when I seen Jerry go in his pants right here, pull the gun out, put it to the side of my baby head and shot (sic) him. I said, "Oh, my God, he done shot my damn baby." So I broke out and I start running.
Ms. Payton further testified that Defendant chased her until she fell to the ground near her house. Defendant then shot her in the upper shoulder as she lay on the ground. The bullet passed through her shoulder and neck into her mouth, and she spit the spent bullet out of her mouth onto the ground. Defendant and the other man left the scene. Paramedics arrived and transported Ms. Payton and Alonzo to the hospital. Alonzo later died as the result of the gunshot wound to his head. A bullet fragment was later recovered from his head.
At the hospital, Ms. Payton could not remember Defendant's name, but she told police that the shooter was one of two brothers who lived on Ziegler Street in Shreveport (a street that is only one block long) and who had "cat eyes." In a photo lineup, Ms. Payton later positively identified Defendant as the shooter. Further, on the morning of the shooting prior to the event, a local pastor had spotted Defendant riding his bicycle and carrying a black handgun near the scene of the crime. Defendant was arrested for the shootings.
Shreveport police officers twice combed the crime scene, which was littered with trash and leaves, and recovered two fired cartridge cases and a spent bullet. One of the spent cartridge cases and the spent bullet were recovered from the area where Ms. Payton was shot. The other spent cartridge case was found near where *160 Alonzo was shot. No weapon was recovered from the scene.
On November 22, 2005, Shreveport police officers were present at the home of Mr. Ervin Armstrong, an acquaintance of Defendant. The police were investigating Mr. Armstrong on an apparently unrelated matter and arrested Mr. Armstrong at his home. The lead detective in the case against Mr. Armstrong was not available to testify because he is serving in the military in Iraq, but several detectives who assisted in that investigation did testify. The details of the offense involving Mr. Armstrong, however, were not disclosed to the jury. After receiving consent to search the residence, police seized a HiPoint .380 ACP handgun from Mr. Armstrong's home.
Police sent the spent cartridge cases, the spent bullet and the firearm to the North Louisiana Crime Lab. At the lab, firearms section supervisor Richard Beighley examined the evidence. Mr. Beighley, who has a college degree in biology, has, worked in the crime lab as the lab's firearms examiner since 1988. He is a member of several professional organizations, including the Louisiana and International Associations for Identification, the Association of Firearm and Tool Mark Examiners and the Southern Association of Forensic Science. Mr. Beighley had testified as an expert witness in his field more than 300 times in parishes all over Louisiana and in Federal court.
Mr. Beighley testified about the procedures he used to examine evidence, particularly the process he used to determine whether the submitted spent cartridges and the bullet were shot from the firearm recovered in Mr. Armstrong's house. Defense counsel questioned him in detail and in particular about the lack of a potential error rate:
Q (Defense counsel): Whenever you measure anything in science like the distance from the Earth to the Moon, you have a plus and minus error rate and you can measure it with a certain accuracy depending upon your equipment. . . . . In this firearms identification, do they have any type of an established accuracy or error rate that can be given with the conclusion?
A (Witness): As far as  I'm not familiar with any type of error rate as far as percentage or I'd say the chance of error in this particular case I feel would be zero.
Q: You're talking about this particular case you come here to testify?
A: Yes.
Q: But what I'm asking you about is in this field, is there a standardized word or term that refers to errors in the field?
A: No, there is not that I'm aware of.
Q: . . . . To the best of your memory, do you ever recall any of the journal articles that talked about errors in the field or error rates or anything like that?
A: Not that I'm familiar with, no.
On redirect examination by the prosecutor, Beighley explained further:
Q: And about the questions regarding error rates, is there a difference in the analysis that you do as to firearm analysis and there be (sic) something along the lines of, let's say, under DNA analysis where you have statistics which come (sic) a part of DNA analysis?
A: My analysis is mainly a visual analysis under the microscope. My results are based on my experience and my opinion. As far as percentages, they're trying to attempt to assign percentages to striations, but in particular at this time there is no sound scientific method that I'm aware of about assigning percentages to striation.
*161 The court accepted Mr. Beighley as an expert witness over the objection of Defendant.
Mr. Beighley determined by visual inspection that both cartridge cases had been fired from the same gun. A bullet was test-fired from the seized Hi-Point pistol, and Mr. Beighley used a forensic comparison microscope to compare that bullet with the bullet recovered from the crime scene, After performing the comparison, Mr. Beighley concluded that the bullet at the crime scene was fired from the pistol. He explained that this visual comparison process was the method generally accepted in the forensic scientific community and has been so accepted since about 1925. Further, the comparison method is subject, both generally and specifically, to peer review; the comparison testing is based on well-understood physical properties of materials and is repeatable and non-destructive.
Mr. Beighley explained that the barrel of the firearm, being harder than the bullet, leaves marks or striations on the bullet as the bullet passes through the barrel. Mr. Beighley also explained that these marks are unique to each gun. A 6" × 8" color photo of the bullets taken through the microscope confirms that the striations on the bullets match each other. Mr. Beighley was not able to positively match the bullet fragment taken from Alonzo's head to the recovered Hi-Point pistol because of the damage to the bullet fragment, but he noted that the bullet fragment had similar general, or class, characteristics as a bullet fired from the seized gun. The trial court allowed Mr. Beighley's testimony into evidence over the objection of Defendant to the relevance and undue prejudice of the testimony. Defendant opted for a jury trial. In addition to the evidence related above, the State offered many other witnesses to describe the course of the investigation. The principal evidence against Defendant, however, was the testimony of Ms. Payton. At trial, Ms. Payton again identified Defendant as the person she saw shoot her son and then stand directly over her and shoot her. Defendant opted to testify; he denied his involvement in the shooting and testified that he was at a residence one street away from the event and heard the shooting.
The jury chose to credit the testimony of Ms. Payton and discredit that of Defendant. The unanimous jury convicted Defendant as charged of one count of second degree murder and one count of attempted second degree murder. The court denied Defendant's motion for post-verdict judgment of acquittal. The court later imposed the mandatory life sentence without benefit of probation, parole or suspended sentence for the second degree murder and, for the attempted crime, sentenced Defendant to serve 37 years' imprisonment at hard labor without benefits to run concurrently. Defendant now appeals arguing that the trial court erred in allowing Mr. Beighley to testify as an expert and also erred in allowing the firearm to be introduced into evidence because it was irrelevant, confusing and highly prejudicial.

DISCUSSION

Expert Testimony
Defendant urges that the trial court erred in admitting the testimony of Mr. Beighley which proved that the spent bullet found at the crime scene was fired from the Hi-Point pistol seized by police. Defendant argues that the failure to present any error rate in his firearm identification demonstrates that the testimony of *162 Mr. Beighley failed to meet the Daubert[1] criteria and was, therefore, insufficiently reliable to be admitted.
The Louisiana Supreme Court explained the test for admissibility for expert testimony at trial and the standard of review on appeal in State v. Kennedy, 05-1981 (La.5/22/07), 957 So.2d 757, fn. 42:
As a general matter, under the standards set out in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which this Court explicitly adopted in State v. Foret, 628 So.2d 1116, 1121 (La. 1993) (Louisiana's La. C.E. art. 702 "virtually identical to its source provision in the Federal Rules of Evidence . . . [Rule] 702"), the trial court is required to perform a "gatekeeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589, 113 S.Ct. at 2795. In performing this function, a trial court must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. Kumho Tire Company, Ltd., v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999). While Daubert specifically addressed scientific evidence, Kumho made clear that the trial court's essential gatekeeping function applies to all expert testimony, including opinion evidence based solely on special training or experience. Id., 526 U.S. at 148-49, 119 S.Ct. at 1174-75. In the end, "the trial judge must determine whether the testimony has `a reliable basis in the knowledge and experience of [the relevant] discipline.'" Id., 526 U.S. at 149, 119 S.Ct. at 1174 (quoting Daubert, 509 U.S., at 592, 113 S.Ct. at 2796.) "Whether Daubert's specific factors are, or are not, reasonable measures of reliability . . . is a matter that . . . the trial judge [has] broad latitude to determine," and a decision to admit or exclude is reviewed on an abuse-of-discretion standard. Id., 526 U.S. at 153, 119 S.Ct. at 1176.
Under Daubert, supra, and State v. Quatrevingt, 93-1644 (La.2/28/96), 670 So.2d 197, cert. den., 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996), relevant factors determining whether scientific evidence is reliable include:
(1) The "testability" of the scientific theory or technique;
(2) Whether the theory or technique has been subjected to peer review and publication;
(3) The known or potential rate of error; and
(4) Whether the methodology is generally accepted in the scientific community.
State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, cert. den., 528 U.S. 1026, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999).
The use of expert testimony to identify spent cartridge cases or bullets to a particular firearm has a long history in Louisiana and elsewhere and has been the subject of Daubert challenges in other jurisdictions. See, e.g., U.S. v. Diaz, 2007 WL 485967 (N.D.Cal.2007) ("No reported decision has ever excluded firearms-identification expert testimony under Daubert."); U.S. v. Monteiro, 407 F.Supp.2d 351 (D.Mass.2006) (collecting cases). The Monteiro case discusses the available literature and evidence regarding the error rate in firearms examination and identification and observes that the extant information *163 about examiner error is limited in its usefulness by the methodology of the studies so far conducted on that topic.
In the instant case, the reliability of Mr. Beighley's testimony is established by the expert's documentation of the process he used to reach his conclusion. In particular, the comparison microscope photograph of the two projectiles provides a particularized record of the expert's methodology. The photo shows dozens of striations on both projectiles, and those striations are identical across the groove in the projectiles cut by the rifling in the barrel. Nothing in our review of the testimony of the expert witness and our visual comparison of the photographs of the two projectiles suggests in any respect that the trial court should have pursued further inquiry into the potential for error. Nothing in the record suggests that the trial court abused its discretion in allowing this testimony. We find, therefore, that this assignment of error is without merit.

Admission of Firearm
Defendant also argues that the trial court should not have allowed the firearm itself to be introduced into evidence be cause it could have misled the jury into thinking that Defendant was connected to another shooting. Defendant notes that police recovered the gun from Ervin Armstrong, a suspect in another shooting. Further, the State suggested that Defendant could have given the gun to Armstrong after the instant crime because there was evidence to show that Defendant was acquainted with Armstrong. Defendant urges that the prejudice to him created by the evidence of this connection outweighs the probative value of the handgun as evidence.
Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. La. C.E. art. 403 states that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." The trial judge determines whether evidence is relevant by deciding whether it bears a rational connection to the fact which is at issue in the case. State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, cert. den., 528 U.S. 826, 120 S.Ct. 75, 145 L.Ed.2d 64 (1999). Likewise, the trial court's determination that evidence is more probative than prejudicial is entitled to great weight, and that determination will not be overturned on appeal in the absence of a clear abuse of discretion. Green v. Claiborne Elec. Co-op., Inc., 28,408 (La.App.2d Cir.6/26/96), 677 So.2d 635.
In the case sub judice, the handgun entered into evidence was shown to be the murder weapon through the testimony of Mr. Beighley, discussed above. The details of the recovery of the gun were not, in and of themselves, incriminating of Defendant. The, jury did not hear the details of the crime of which Mr. Armstrong was accused; that evidence was only offered to explain the location from which the murder weapon had been recovered. The evidence tended to show that Defendant was acquainted with Mr. Armstrong, but the State offered no proof that the two were closely linked or were co-perpetrators of any offense. The weapon itself was relevant to the case in that it was shown to be the murder weapon and matched generally the description of the weapon given by Ms. Payton and by the pastor who saw Defendant with a weapon prior to the shooting. The trial court correctly concluded that any prejudice created by the introduction of the firearm and the details of its *164 recovery was outweighed by the probative value of the evidence. This assignment of error is without merit.

CONCLUSION
For the reasons set forth above, the convictions and sentences of Defendant, Jerry L. Williams, are affirmed.
AFFIRMED.
NOTES
[1] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).