LOLLEY, J.
 

 1 jThis criminal appeal arises from the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana. The defendant, Charles Ray Lindsey, was convicted of aggravated arson, a violation of La. R.S. 14:51, and unauthorized entry of an inhabited dwelling, a violation of La. R.S. 14:62.3. For aggravated arson, the trial court sentenced Lindsey to serve 20 years’ imprisonment at hard labor, two years without parole; for unauthorized entry, the trial court sentenced Lindsey to serve a consecutive six years’ imprisonment at hard labor. Lindsey only appeals his conviction and sentence for the aggravated arson charge, which we affirm for the following reasons.
 

 Facts
 

 The following facts were adduced at Lindsey’s jury trial. In the summer of 2009, Debra Pesina and her two children lived in an apartment at the Westbrook Villa complex in Monroe, Louisiana. She was dating the defendant, Charles Lindsey, but she lived with a male roommate with whom she did not have a romantic relationship. Both Pesina and Lindsey are white; her former roommate is African-American.
 

 
 *568
 
 At the beginning of August, Lindsey-moved into the apartment and Pesina’s roommate moved out at Lindsey’s request. Pesina was the only lessee; Lindsey never signed a lease. Once Lindsey moved in, the couple argued frequently, and the apartment manager received complaints of “yelling” and “screaming” between Pesina and Lindsey from the other tenants.
 

 li>On August 21, 2009, Lindsey demanded that Pesina drive him to the liquor store. Pesina testified at trial that on the way to the liquor store, Lindsey asked her, “Are you f* * * * *g that n* * * *r?” They continued to argue during the drive and later, at home, while Pesina was cooking Lindsey’s meal. Pesina had to run a shopping errand, and while she was away from the apartment, she came to the conclusion that she did not want Lindsey living with her any longer. Thus, she contacted the apartment manager and the West Monroe Police Department (the “WMPD”), and officers met Pesina at the apartment at about 5:00 p.m. A police officer told Lindsey that he had to leave the premises, and Lindsey took only his bottle of Old Charter whiskey with him as he left. The responding officer saw that Lindsey was drunk, and he drove Lindsey to the nearby police station. There, the defendant called his aunt, Barbara Aswell, to come and pick him up.
 

 After Lindsey was taken from the apartment, Pesina also left the apartment and drove to the workplace of her former roommate to talk with him. While she was there she got a cell phone call. Her phone’s caller ID indicated that the call came from her apartment. The caller initiating the call from her apartment was the defendant. She testified that Lindsey said, “I told you I’d get even with you and I told you I’d get you.” Pesina told the defendant, “Oh, really? Well, I got you,” and hung up the phone. Pesina then called the police again, and an officer met her at the apartment at about |¾7:15 p.m. Lindsey was not present, but one of the rear windows was open. Pesina gathered some personal items and left to stay with a friend in Tallulah.
 

 Meanwhile, when Aswell arrived at the police station to pick up Lindsey, she could not find him, so she left to return home. The reason she could not find Lindsey was because he had left the police station and gone to Pesina’s apartment. Surveillance video from a convenience store across the street from Pesina’s apartment shows that Lindsey entered the store at about 8:35 p.m. The cashier, Heather Hampton, was acquainted with both Lindsey and Pesina, because they frequented the store to buy cigarettes. According to Hampton, on August 21, Lindsey bought only one item: a cigarette lighter. Hampton also testified that the defendant had been drinking and that he said that he was “going to burn the bitch’s apartment down,” referring to Pesi-na. She further said that as he left, he said “I’m going to kill the bitch!”
 

 At approximately 9:00 p.m., the fire department was dispatched in response to a report of a fire at the apartment building. The fire was reported by another of the several different residents in the same apartment building where Pesina’s apartment was located. Numerous fire and police units responded to the scene.
 

 While Aswell was driving back home, she received another call from Lindsey, who had returned to the police station, asking her to pick him up. After she did so and upon leaving the police station, she saw a number of fire trucks responding to a fire. She wondered aloud where the trucks were Lgoing, and Lindsey responded, “I set fire to the apartment.” When Aswell expressed doubt about the story, Lindsey said, “If you don’t believe me, Aunt Barbara, follow them.” She did so
 
 *569
 
 and saw that Pesina’s apartment was on fire. After being assured that Pesina and her children were not injured, Aswell told police that Lindsey was in her vehicle.
 

 Lindsey was arrested and informed of his
 
 Miranda
 
 rights. In Aswell’s vehicle, police found a cigarette lighter, a soft drink, and a bottle of whiskey. Aswell informed the police that the items did not belong to her. Lindsey was placed in the back of a patrol car, which was equipped with a video and audio recording system that recorded all of his statements along with the public safety radio traffic during the time he was in the car. At the beginning of the recording, during questioning, Lindsey denied having left the police station earlier that evening. After a few brief questions, the officers left Lindsey alone in the car. From that point on, the video captured numerous spontaneous and profanity-laced outbursts from Lindsey, sometimes in response to radio traffic:
 

 What the f* * * you got on me? You ain’t got s* * * on me.... F* * * yPall man. F* * * the snitches_ Five minutes my mother f* * * * * * ass! ... I love you Aunt Barbara! Stupid bitch! Why’d you tell on me? (Unintelligible) keep your mouth shut! ... Barbara ain’t nothing but a f⅜ * * * * * snitch! Barbara’s a snitch! ... F* ⅜ ⅜ * * * bitch.
 

 When an officer returned to the car, Lindsey asked the officer, “Have you got an eyewitness? You ain’t got an eyewitness, motherf* * * * *, you ain’t got nothing.” At one point, without being prompted, Lindsey referred to phone records in reference to proof of his location.
 

 | ¡An officer drove Lindsey to the police station for questioning. When Lindsey arrived at the police station, he was
 
 Miran-dized
 
 again and interviewed by WMPD Sergeant Christopher Thurmon. According to Sgt. Thurmon, Lindsey smelled strongly of smoke, which did not smell like cigarette smoke.
 

 Lindsey agreed to speak about the incident, and one of the first things he said was, “I did not start the fire.” He also said that he had stayed at the police department the entire time from when he first arrived until the time his aunt came to pick him up. Later, Lindsey told the detective that he had “beaten this rap before in another state,” and that the police “didn’t have any witnesses.” Lindsey informed the detective that he was “going to beat it again.”
 

 The fire investigator for the City of Monroe, Charlie Simmons, arrived at the apartment complex at about 9:00 p.m. that night. The fire fighters had extinguished the fire by the time he arrived. Officer Simmons examined Pesina’s apartment and concluded that the fire started on the couch because that was the only area that had any flame damage. He also observed that there was heat damage inside the kitchen, and he discovered that the front right burner on the electric stove had been left “all the way on.” However, Off. Simmons concluded that the stove was not an origin of the fire. He found no evidence that an accelerant was used.
 

 Along with Sgt. Thurmon, Off. Simmons also participated in the interview of Lindsey at the police station, and reported that Lindsey told them that “he’d beat an arson rap before.” Like the detective, the | (¡investigator reported that Lindsey smelled strongly of smoke that was not cigarette smoke.
 

 Later that night, the fire in Pesina’s apartment rekindled. This time, the fire was much larger than the first fire, and ultimately destroyed 16 apartments — essentially the entire building — leaving up to 60 residents without homes. Ultimately, Lindsey was charged by Bill of Informa
 
 *570
 
 tion with aggravated arson and the unauthorized entry of an inhabited building.
 

 Lindsey chose to testify at his trial. He said that, on the day of the fire, he probably did ask Pesina if she was having sex with her roommate, but explained that he had been drinking quite a bit that day, he loved Pesina, and “you say things in a jealous rage.” However, Lindsey flatly denied having set the fire, saying that he smoked about two packs per day and that he often smoked on the couch in the apartment, sometimes falling asleep with a cigarette in his mouth or hand. He admitted that he had been in the apartment “maybe ... an hour and a half’ before the fire. On cross-examination, Lindsey said that he lied to the officers about never leaving the police station because “me and the officers wasn’t on the right track and we was arguing all night long.” He said that he was only joking when he told the convenience store clerk and his aunt about his role in the fire.
 

 Based on all of the evidence presented, the jury convicted Lindsey as charged. The trial court sentenced Lindsey to 20 years at hard labor for the arson and a consecutive six years at hard labor for unauthorized entry. The trial court justified the maximum consecutive sentences citing numerous | factors, including the risk of harm to more than one person and personal and economic harm done by the offenses. Lindsey was also ordered to make restitution to Pesina, Lisa Sims (the owner of the apartment complex), and Chubb Insurance Group (the property insurer). The trial court denied Lindsey’s motion to reconsider sentence, and Lindsey’s appeal of his conviction and sentence for aggravated arson ensued.
 

 Discussion
 

 Lindsey’s first two assignments of error are related and are addressed together. First, he argues that the state failed to prove a
 
 corpus delicti.
 

 [1]
 

 He also submits that the evidence against him was insufficient to support the conviction. Specifically, he urges that the state did not prove that he intentionally set the fire or disprove his hypothesis that the fire was of accidental origin. Regarding the
 
 corpus delicti,
 
 he also argues that there was no proof that the fire was the result of any criminal act. We disagree on both points.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia, 44
 
 3 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.05/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 8U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Carter,
 
 42,894 (La.App.2d Cir.01/09/08), 974 So.2d 181,
 
 writ denied,
 
 2008-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.02/22/06), 922 So.2d 517;
 
 State v. Dotie,
 
 43,819 (La.App.2d Cir.01/14/09), 1 So.3d 833,
 
 writ denied,
 
 2009-0310 (La.11/06/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s
 
 *571
 
 decision to accept or reject the testimony of a witness in whole or in part.
 
 State v. Blow,
 
 45,415 (La.App.2d Cir.08/11/10), 46 So.3d 735.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Speed,
 
 43,786 (La.App.2d Cir.01/14/09), 2 So.3d 582,
 
 writ denied,
 
 2009-0372 (La.11/06/09), 21 So.3d 299.
 

 | gLouisiana R.S. 14:51 provides, in part that, “Aggravated arson is the intentional ... setting fire to any structure ... whereby it is foreseeable that human life might be endangered.”
 

 It is well settled that a person cannot be convicted on his or her confession alone.
 
 State v. Hopkins,
 
 35,146 (La.App.2d Cir.11/02/01), 799 So.2d 1234. The corroboration rule requires that there be some evidence, besides the confession, that a criminal act was committed by someone.
 
 State v. Hopkins, supra; State v. Cutwright,
 
 626 So.2d 780, 783 (La.App. 2d Cir.1993),
 
 writ denied,
 
 632 So.2d 761 (La.1994). As the Louisiana Supreme Court explained:
 

 Under the Louisiana corpus delicti rule, an accused cannot be convicted on his own uncorroborated confession without proof that a crime has been committed by someone. In a homicide case, the corpus delicti consists of proof that the victim died and that the death was caused by a criminal act. This independent proof need not go to every element of the offense; and, it may be either direct or circumstantial in nature. The prosecution must show “that the injury specified in the crime occurred and that the injury was caused by someone’s criminal activity.”
 

 State v. Thibodeaux,
 
 1998-1673 (La.09/08/99), 750 So.2d 916, 926,
 
 cert denied, Thibodeaux v. Louisiana,
 
 529 U.S. 1112, 120 S.Ct. 1969, 146 L.Ed.2d 800 (2000).
 

 The gist of Lindsey’s
 
 corpus delicti
 
 argument is that the state failed to prove that the fire was the result of a criminal act, i.e., that the fire was deliberately set or was of other than accidental origin. The fire marshal found no evidence of the use of accelerants in the fire, and no witness saw Lindsey set the fire.
 

 | min this case the evidence of Lindsey’s criminal act was both direct and circumstantial, and the absence of forensic proof of arson is not fatal to the case against him. Although earlier in the day of the fire, Lindsey had been driven to the nearby police station, he later placed a call to the victim from inside her apartment, saying, “I told you I’d get even with you and I told you I’d get you.” Just prior to the reporting of the fire, Lindsey visited a convenience store across the street from the victim’s apartment. At the store, he bought a single item — a lighter — and told the cashier that he was “going to burn the bitch’s apartment down.”
 

 Because of the proximity of the police station, the convenience store and the apartment, Lindsey had the opportunity to enter the apartment and start a fire within a short time frame. Next, Lindsey returned to the police station and waited for his aunt to arrive; in the meantime, the
 
 *572
 
 fire was reported by a nearby tenant. When Lindsey and his aunt left together, he confessed to his aunt that “I set fire to the apartment” and invited her to verify his claim: “If you don’t believe me, Aunt Barbara, follow them.” After his arrest, he repeatedly referred to his aunt as a snitch and was upset with her for talking to the police. Moreover, Lindsey, who claimed to have been at the police station the entire time before the fire, smelled strongly of smoke, and, according to the police officer, the smell was distinct from the smell of cigarette smoke.
 

 These facts are plainly sufficient to prove beyond a reasonable doubt that the fire was the result of a criminal act: Lindsey set the victim’s couch on fire during the time he was in the apartment after buying the lighter at the Inconvenience store. The facts exclude every reasonable hypothesis of innocence, such as an accidental fire caused by a smouldering cigarette; the single conclusion to be drawn from these facts is that Lindsey deliberately set the fire in order to, in his words, “get even with” Pesina, who had just evicted him from the apartment. Lindsey’s confession had ample corroboration and there was clearly sufficient evidence to convict him of the crimes charged. Accordingly, we determined that these assignments of error are without merit.
 

 In his third assignment of error, Lindsey argues that the trial court erred when it denied his motion for a mistrial, which he submits was based on a highly prejudicial response by a witness. Specifically, Lindsey states that the trial court should have declared a mistrial upon the evocation from Pesina that Lindsey accused her — in a shocking and inflammatory way — of having sex with her African-American roommate. Pesina testified that Lindsey had asked her, “Are you f* * * * *g that n* * * *r?” Lindsey complains that this phrase “was carefully sought out by the State” and that the primarily African-American jury was irretrievably prejudiced against him after hearing Pesina relate what he said to her prior to the commission of his crimes. We disagree.
 

 Louisiana C. Cr. P. art. 775 provides, in part, that, “Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.”
 

 |12The effect of a defendant’s use of racial epithets in out-of-court statements has been addressed in the jurisprudence. In
 
 State v. Mayeaux,
 
 570 So.2d 185 (La.App. 5th Cir.1990),
 
 writ denied,
 
 575 So.2d 386 (La.1991), the prosecutor played for the jury a tape-recorded conversation where the defendant used the same racial epithet used here. The trial court denied the defendant’s motion for a mistrial, and the appellate court affirmed, stating in part:
 

 The trial judge carefully evaluated the prejudicial effect and inflammatory nature of the challenged reference by considering the reference in context with the statement of which it is a part. He concluded that this reference was not racially motivated, but rather was characteristic of the defendant’s manner of expressing himself. This conclusion seems to be well supported as the defendant used numerous expletives in the portion of the recorded conversation submitted for review.
 

 Id.
 
 at 189.
 

 Likewise, in this case, the jury was entitled to hear what Lindsey had told Pesina on the morning of the day of this incident despite the danger of unfair prejudice. That remark was the one that precipitated
 
 *573
 
 Pesina’s decision to evict Lindsey from the apartment, and, as Lindsey himself explained at trial, it also showed the extent of his jealous rage toward Pesina. Thus, although the remark contained a highly offensive word, inclusion of Lindsey’s remark was necessary because the remark commenced the series of events that led to the fire and was probative of Lindsey’s motive and intent to commit the offenses. Although the remark was undoubtedly prejudicial, Lindsey’s words served several important evidentiary purposes whose relevance outweighed the unfair prejudice of 11Rthe statement. Thus, we do not believe the statement related by Pesina at the trial and attributed to Lindsey was unreasonably prejudicial, and conclude that this assignment of error is without merit.
 

 In his final assignment of error, Lindsey submits that the trial court erred by allowing the photographs from the “rekindle” fire. He makes a brief argument that the trial court should not have allowed the prosecutor to introduce into evidence the photos of the burned apartment building that were taken after the second fire. The record shows that Lindsey objected to the “rekindle” photos prior to the taking of evidence and that the trial court overruled that objection.
 

 As explained in
 
 State v. Williams,
 
 42,914 (La.App.2d Cir.01/09/08), 974 So.2d 157, 163,
 
 writ denied,
 
 2008-0465 (La.09/26/08), 992 So.2d 983:
 

 Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 403 states that “although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” The trial judge determines whether evidence is relevant by deciding whether it bears a rational connection to the fact which is at issue in the case. Likewise, the trial court’s determination that evidence is more probative than prejudicial is entitled to great weight, and that determination will not be overturned on appeal in the absence of a clear abuse of discretion. (Citations omitted.)
 

 In this case, Lindsey was charged with aggravated arson. One of the elements of that offense is proof that the fire was set “whereby it is foreseeable that human life might be endangered.” There are many possible | uoutcomes when a fire is set in a crowded building, none of them good. One possibility is the outcome in this case: the fire was detected early and apparently extinguished, but the fire rekindled and caused severe damage. Because of the varied and uncertain outcomes for a fire set in an inhabited structure, and because the concept of foreseeability is very fact-dependent, the state was entitled to present the “rekindle” photo evidence to show that Lindsey’s actions posed a real and substantial danger to human life. This assignment of error is without merit.
 

 Conclusion
 

 Considering the foregoing, the conviction and sentence of Charles Ray Lindsey for aggravated arson are affirmed.
 

 AFFIRMED.
 

 [1]
 

 .
 
 Corpus delicti
 
 is defined as, "The fact of a transgression.... ‘The phrase
 
 “corpus de-licti "
 
 does not mean dead body, but body of the crime, and every offense has its
 
 corpus delicti.'" Black’s Law Dictionary,
 
 (9th ed.2009), quoting, Rollin M. Perkins & Ronald N. Boyce, Criminal Law 140 (3d ed.1982).